# Illinois Official Reports

## Supreme Court

*Nationwide Financial, LP v. Pobuda*, 2014 IL 116717

Caption in Supreme Court:     NATIONWIDE FINANCIAL, LP, Appellee, v. MICHAEL THOMAS POBUDA *et al.*, Appellants.

Docket No.     116717

Filed     September 18, 2014
Rehearing denied     November 24, 2014

Held

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

Defendants who counterclaimed for a prescriptive easement after being sued for wrongful trespass were improperly denied summary judgment where, for more than 20 years, they had avoided obstructions caused by utility installations and mature trees by driving over a corner of plaintiff titleholder's property to reach a road providing access from both of the otherwise landlocked properties to the main highway—adversity and exclusivity elements established and titleholder's complete deprivation of use held not required to prove the latter.

Decision Under Review     Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Franklin U. Valderrama, Judge, presiding.

Judgment     Judgments reversed.
Cause remanded.

| Counsel on Appeal | Michael T. Pobuda and Laura J. Pobuda, *pro se*, of Barrington, for appellants. |
|---|---|
| | Gino L. DiVito, Mark H. Horwitch, John M. Fitzgerald and Brent M. Ryan, of Tabet DiVito & Rothstein LLC, Robert S. Schwartz, of Robinson Shapiro & Schwartz LLC and Anthony M. Sciara, of Harvey Kruse, P.C., all of Chicago, for appellee. |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion. <br> Chief Justice Garman and Justices Freeman, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, Nationwide Financial, LP (Nationwide), filed suit against defendants, Michael Pobuda and Laura Pobuda, seeking a declaratory judgment that the Pobudas' use of a certain strip of land owned by Nationwide amounted to a trespass. The Pobudas counterclaimed, alleging, among other things, that they enjoyed a prescriptive easement to travel over the disputed land. The parties filed cross-motions for summary judgment and the circuit court of Cook County ruled in favor of Nationwide. The court concluded that the Pobudas' claim of a prescriptive easement failed as a matter of law because they did not establish that their use of the portion of property in question was "exclusive" to the point of dispossessing the owner of its use. The Pobudas appealed, and the Appellate Court, First District, affirmed. 2013 IL App (1st) 122540-U. The appellate court held that the outcome was governed by a line of first district cases (see, *e.g.*, *Catholic Bishop of Chicago v. Chicago Title & Trust Co.*, 2011 IL App (1st) 102389) that require the claimant of an easement to show that the true owner of the property was altogether deprived of its use. 2013 IL App (1st) 122540-U, ¶¶ 34-35. We allowed the Pobudas' petition for leave to appeal, and for the reasons that follow, we reverse the judgments of the circuit and appellate courts.

¶ 2                                    BACKGROUND

¶ 3    In June 2008, Nationwide became the owner of a parcel of land commonly known as 275 Donlea Road, Barrington Hills, Illinois (the 275 property). The Pobudas have owned and been in possession of the adjacent lot to the west, located at 281 Donlea Road (the 281 property), since December 1986. The portion of the Nationwide 275 property in dispute here is described as follows: "the north 48 feet of the west line and the west 33 feet of the north line, in the northwest corner of [the 275 property]." Herein, we will refer to this disputed 33 × 48 foot strip of property as "the northwest corner of the 275 property" or the "northwest strip."

¶ 4     Both the northwest corner of the 275 property and the adjoining northeast corner of the 281 property are located approximately 609 feet south of Donlea Road. Both properties would have been landlocked but for a long gravel road easement that runs south from Donlea Road over other property to reach them. In that regard, the owners of both the 275 property and the 281 property were each granted a shared 66-foot-wide by 609-foot-long easement—recorded in November 1956—for the purpose of utility service and access from Donlea Road to their respective properties. Additionally, in April 1957, the then owners of the 281 property granted Commonwealth Edison a utility easement upon, under and along the north 10 feet of the west 10 feet of the east 33 feet of the 281 property. Neither of these recorded easements is directly challenged in this case.

¶ 5     The Pobudas' verified amended counterclaim alleges that access to their 281 property is impossible without crossing the northwest corner of the 275 property because utility equipment and mature trees and shrubs block access on the north line of their property. The utility equipment was installed and has been in operation since 1957. It supplied utility service for the mutual benefit of both the 275 and 281 properties. The Pobudas claim that access to their property from the public road is only possible by car or other vehicle by traveling the length of the 609-foot gravel access road to where it meets and continues over unto the northwest corner of the 275 property en route to the 281 Donlea property driveway, which opens onto the west side of the northwest corner of the 275 property.

¶ 6     The Pobudas allege that they have traveled over the northwest corner strip of the 275 property "during various hours of the day and night, 6 to 7 days each week, for 52 weeks each year, in an open, visible, notorious, peaceful, uninterrupted adverse manner, during the 22 year plus period from December 12, 1986, through approximately March 2009." They also claim that the prior owner of the 275 property, Mary Jane Burton, whose ownership spanned nearly 39 years running from November 1969, through June 2008, observed them using the strip when their automobiles passed while heading in opposite directions over the northwest corner of the 275 property. The Pobudas assert that their use of the 275 property's northwest corner for access to and exit from the 281 property was never raised as an issue or even discussed with anyone at any time prior to May 2009. No lease was ever executed or discussed with respect to the strip in question. Nor was oral permission to use it ever requested, given or discussed. The Pobudas allege that their relationship with Burton was "civil." The Pobudas further assert that from December 1986 to the present, they have "continuously acted under a claim of right, adversely and in disregard of the rights of others to use the 275 Donlea Property's northwest corner." They claim that from December 1986 to the present, they have "regularly plowed snow, mowed grass, filled in low spots with road gravel, raked leaves, swept debris, picked-up sticks, patched and seal coated the driveway surface, on, upon and across the 275 Donlea Property's northwest corner."

¶ 7     The Pobudas also allege the following:

"During the period of December 12, 1986 through the present date, [the Pobudas], under a claim of right, openly, visibly, notoriously and adversely, used the [northwest corner of the 275 property]:

A. to travel to and from [their] home and [their] garage located on [their 281 property];

B. to receive deliveries from the U.S. Postal Service, from UPS, from FedEx and from other delivery services;

C. to receive services provided by home repair contractors, appliance repairmen and other repair service personnel;

D. for utility company personnel to read utility meters and service utility equipment in [their] home; and

E. for the garbageman to pick-up [their] garbage."

¶ 8 In addition, the Pobudas allege that during the period of December 1986 to the present, their family, friends, invited guests, and visitors traveled over the northwest corner of the 275 property. The Pobudas themselves used the strip openly and under a claim of right by traveling over it by car, truck, on foot and on bicycle.

¶ 9 The Pobudas claim that Nationwide's predecessor in title, Burton, acknowledged the Pobudas' claim of right and adverse interest in the northwest corner of the 275 property in the following ways:

"A. by not resurfacing the northwest corner [of the 275 property] claimed by [the Pobudas] at the time that [Burton] had her entire driveway resurfaced;

B. by planting new trees adjacent to, but east of, and outside of, the area of the northwest corner easement claimed by [the Pobudas], when said prior owner re-landscaped the northwest corner area of her 275 Donlea Property;

C. by never blocking, obstructing, restricting or closing off any portion of the northwest corner easement claimed by [the Pobudas]."

¶ 10 Finally, the Pobudas claim that their predecessor in title, Mary Ann Mayworm (and her family), used the northwest corner of the 275 property continuously for a 15-year period from June 1971 through December 1986 under a claim of right. The record contains an affidavit by Mayworm in which she attests that she lived at 281 Donlea Road from 1971 through 1986, when she sold the property to the Pobudas. She attested that during the time that she lived at the 281 property, she, her family, and their visitors traveled over the northwest corner of the 275 property en route to and from Donlea Road and to and from her home. Moreover, her husband maintained the northwest corner strip by plowing snow off the surface of the driveway and performing other maintenance work. She further attested that:

"8. During the entire 15 years that [she] resided at the 281 Donlea Property, [she] never asked the owners of the 275 Donlea Property, or anyone else to buy, lease or for permission to use or travel over the northwest corner of the 275 Donlea Property;

9. During the entire 15 years that [she] resided at the 281 Donlea Property, [she] was never advised by anyone that permission or an oral or written lease was necessary to use or travel over the northwest corner ***;

10. When [she] purchased the 281 Donlea Property in 1971, [she] was never informed by the former owners, Jess Nicks and Barbara M. Nicks, that permission or an oral or written lease was necessary to use or travel over the northwest corner ***;

11. At the time [she] purchased the 281 Donlea Property in June 1971, a Commonwealth Edison transformer box and various other pieces of above-ground utility equipment were physically located on the northeast corner of [her] 281 Donlea Property;

12. At the time she purchased the 281 Donlea Property ***, there was no above-ground utility equipment located on the Burtons' 275 Donlea Property and there was sufficient room on the 275 Donlea Property for two vehicles to pass each other as they were entering and leaving the gravel access road easement;

13. The above-ground utility equipment located on [her] 281 Donlea Property in June 1971 served both the [275 and 281 properties] during the entire 15 year period that [she] resided at 281 Donlea Road;

14. During the entire period of June 1971 through December 1986, the paved asphalt driveway on [her] 281 Donlea Property continued across the northwest corner of the Burtons' 275 Donlea Property and ended at the point where the gravel access road easement, leading to Donlea Road, began;

15. During the entire period of time that [she] resided at [her] 281 Donlea Property, access to [her] 281 Donlea Property, directly from the gravel road easement, was blocked by the above-ground utility equipment, utility easements and mature trees and bushes;

16. From June 1971 through December 1986, [she and her family] continually used, maintained and traveled over the northwest corner of the 275 Donlea Property; [her] travel across the northwest corner *** was frequently observed by the Burtons *** during this period; during this entire period of time[,] both [she] and [her] family claimed that it was [their] right to travel over the northwest corner of the 275 Donlea Property to reach [their] gravel road easement leading to Donlea Road;

17. During the period of June 1971 through December 1986, the owners of the 275 Donlea Property never objected or otherwise questioned [her] claim of right and [her] open and continuous use of the northwest corner of the 275 Donlea Property."

¶ 11   Mayworm also gave deposition testimony that generally covered the matters in her affidavit and was largely consistent therewith. She testified that she used the gravel road easement to travel from Donlea Road toward her home. After traveling down the long gravel road, there was a split, and her driveway went to the right and the 275 property's driveway went to the left. When first asked whether there was any other property that she traveled over en route to her property from Donlea Road, Mayworm answered in the negative. After being shown pictures of the area where her driveway met the northwest corner of the 275 property, however, she testified that the blacktop driveway running from her home on the 281 property did in fact cross the 275 property, connecting up to the start of the long gravel road easement that led to Donlea Road.

¶ 12   Mayworm further testified that when she had her driveway resurfaced, she only had it resurfaced up to the point where her property line met the 275 property to the east, despite the fact that the rest of her blacktop driveway actually ran over onto the northwest corner of the 275 property to meet the recorded gravel road easement to the north. After the resurfacing was completed, she continued to use both her resurfaced driveway and the part of her driveway that she did not have resurfaced to reach the gravel road easement. She was never informed at any time that permission or a lease was required to travel over the northwest corner of the 275 property. Moreover, when she bought her 281 property in 1971, the route in question was the only route to and from her property. This route was the same one and the only one she used after she purchased the property and is the same, lone route that existed at

the time of her deposition. During the 15 years that she lived at the 281 property, Mayworm was not aware that her driveway and the open area located adjacent to the driveway ran across the northwest corner of the Burtons' 275 property. Moreover, no one ever complained or attempted to stop or restrict Mayworm or her family from using or maintaining the way over the northwest corner. Her family maintained the way over the northwest corner by plowing the snow off and resurfacing the gravel.

¶ 13　　Mayworm also testified that her relationship with the Burtons was cordial, friendly and neighborly, but Mayworm never discussed with the Burtons her use of the area she considered her driveway that led out to the gravel road easement. Nor did they ever discuss permission or a need for a lease. When asked by counsel for Nationwide whether her use of the northwest corner of the 275 property was "hostile" or under a "claim of right," Mayworm demonstrated that she lacked understanding of the legal meaning of those terms and gave conflicting answers. The Pobudas then objected to this line of questioning, arguing that it was clear from Mayworm's testimony that she did not understand the legal conclusions called for by counsel's questioning but that it was also clear from her testimony that she had believed that the northwest corner strip was her property and that she had the right to travel over it.

¶ 14　　In May 2009, Nationwide demanded the Pobudas cease using the northwest corner of the 275 Donlea Road property or pay a rental fee for the continued use. The Pobudas refused to do so. Nationwide eventually filed a complaint for a declaratory judgment against the Pobudas, asking the court to determine that the Pobudas' use of the northwest corner strip was a wrongful trespass. The Pobudas then filed counterclaims for a declaratory judgment of a prescriptive easement, interference with an express easement, and a declaratory judgment regarding certain developmental modifications in order to prevent flooding on the Pobudas' property.

¶ 15　　Pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)), Nationwide moved to dismiss counts I and II of the counterclaims, which dealt with allegations of a prescriptive easement. The trial court granted Nationwide's motion and dismissed the prescriptive easement claims without prejudice. The Pobudas then filed amended counterclaims that realleged their counterclaims for a prescriptive easement. Nationwide again filed a section to 2-615 motion to dismiss, arguing that the claims should be dismissed because the Pobudas failed to allege both that their use was exclusive and adverse to the owners of the 275 property. The trial court denied Nationwide's motion to dismiss the amended complaint on January 7, 2011.

¶ 16　　Many more motions were filed during the ensuing months. In March 2012, the Pobudas filed a motion for summary judgment on their amended complaint, asserting that there were no material facts in dispute concerning whether their travel over and maintenance of the northwest corner of the 275 property was wrongful. They argued that the pleadings, affidavits, exhibits and deposition testimony on file established as a matter of law that their use of the strip was not wrongful because they have a prescriptive easement.

¶ 17　　Nationwide filed a combined response to the Pobudas' summary judgment motion and a cross-motion for partial summary judgment as to liability on its amended complaint. In its motion, Nationwide asserted that by filing its cross-motion for summary judgment it was inviting the court to decide the issues as a matter of law. Nationwide asserted that the Pobudas did not have a prescriptive easement because they had failed to establish exclusive

use, which according to Nationwide, required the Pobudas to show that the owner of the 275 property had been "altogether deprived of possession" of the northwest corner strip. Nationwide argued that *Catholic Bishop of Chicago v. Chicago Title & Trust Co.*, 2011 IL App (1st) 102389, *City of Des Plaines v. Redella*, 365 Ill. App. 3d 68, 76 (2006), and *Chicago Steel Rule Die & Fabricators Co. v. Malan Construction Co.*, 200 Ill. App. 3d 701, 707 (1990), were dispositive on the exclusivity element. Nationwide further argued that the Pobudas could not establish the element of adversity because they could not show that their use was not a permissive one arising out of a neighborly relationship.

¶ 18    The Pobudas filed a response and reply to Nationwide's combined motion. The Pobudas attempted therein to distinguish *Catholic Bishop*, but they also referenced this court's understanding of the exclusivity element as set forth in *Schmidt v. Brown*, 226 Ill. 590, 599 (1907):

> " 'Exclusive use' does not mean that no one used the way except the claimant of the easement. It means no more than that his right to do so does not depend on a like right in others. The use may be exclusive, within the meaning of this rule, even though [the owner] and others also used the road."

¶ 19    With respect to the element of adversity, the Pobudas argued that where a claimant has successfully pled the elements of open, continuous and exclusive use for the requisite 20-year period, and the origin of the way has not been shown, adversity is presumed. *Rush v. Collins*, 366 Ill. 307, 315 (1937). The Pobudas pointed out that there was no evidence presented to show that either their use or Mayworm's use of the northwest corner strip was by permission. Moreover, the fact that Mayworm's relationship with the Burtons was cordial or neighborly is irrelevant to the question of adversity where the origin of the easement was unquestionably unknown and use of the way predated 1971 when Mayworm became the owner of the 281 property and began using the northwest strip.

¶ 20    In July 2012, the trial court granted Nationwide's cross-motion for partial summary judgment and denied the Pobudas' motion for summary judgment. In its oral pronouncement of its ruling, the court began by noting that it was "bound and it must follow the cases in the first district." Therefore, pursuant to *Catholic Bishop*, the court concluded that it was "constrained and must find that the element of exclusivity requires a party claiming a prescriptive easement to establish that during the relevant time period, the true owner was dispossessed use of the subject property." Because the Pobudas did not show that Nationwide's predecessor in title was altogether dispossessed of the northwest strip, the court found that the Pobudas failed to show exclusive use of the northwest strip, and accordingly, they failed to state a claim for a prescriptive easement. Finally, the court explained that having found the element of exclusivity unsatisfied, it was unnecessary to address the other element of adversity.

¶ 21    The Pobudas appealed, and the Appellate Court, First District, affirmed. Relying upon *Catholic Bishop*, the appellate court determined that a strict application of the exclusivity element for a prescriptive easement was required under Illinois law such that the claimant of the easement must show that the owner of the property had been "altogether deprived of possession." 2013 IL App (1st) 122540-U, ¶¶ 27-34. The appellate court acknowledged that a majority of jurisdictions do not require such strict exclusivity in claims for prescriptive easements. *Id*. ¶ 36. The appellate court concluded, however, that it was "not at liberty to

depart from the line of previous [first district appellate court] rulings requiring [strict] exclusivity to establish an easement by prescription. See, *e.g.*, *Catholic Bishop of Chicago*, 2011 IL App (1st) 102389, ¶ 31; *Chicago Steel*, 200 Ill. App. 3d at 705; *City of Des Plaines*, 365 Ill. App. 3d at 76." 2013 IL App (1st) 122540-U, ¶ 36. The appellate court found that the Pobudas failed to state a claim for a prescriptive easement because they could not show that the owners of the 275 property were altogether deprived of use or possession of the northwest corner strip, as the uncontested evidence clearly showed that Burton (Nationwide's predecessor in title to the 275 property) regularly traveled over the northwest corner strip. *Id.* ¶ 35. The appellate court did not address the element of adversity. See *id.* ¶ 40. Finally, the appellate court found that the Pobudas' request to transfer the case to a different county because of bias against them in the circuit court of Cook County was moot, and at any rate, the Pobudas' allegations of bias amounted to nothing more than that the trial court did not agree with their version of the law of the case. *Id.*

¶ 22    The Pobudas filed a petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2013)), which we granted.

¶ 23                              ANALYSIS

¶ 24    This appeal arises from an order granting partial summary judgment to Nationwide and denying summary judgment to the Pobudas. Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). Where the parties file cross-motions for summary judgment, as they did in this case, they concede the absence of a genuine issue of material fact and agree that only questions of law are involved, and they invite the court to decide the issues based on the record. *Martin v. Keeley & Sons, Inc.*, 2012 IL 113270, ¶ 25; see also *Steadfast Insurance Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755 (2005). This court reviews summary judgment orders *de novo*. *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 399-400 (2010).

¶ 25    Before this court, the Pobudas argue that the appellate court erred in affirming the award of summary judgment in favor of Nationwide regarding the prescriptive easement. The Pobudas assert that they have established all of the elements required for a prescriptive easement, including exclusivity and adversity. They maintain that the appellate court's strict application of the exclusivity element obscures the well-established conceptual distinction between adverse possession and easements by prescription. They argue that the appellate court's decision conflicts with the settled precedent of this court, which holds that it is not necessary for the easement claimant to deprive the owner of use or possession of the way in question to acquire a prescriptive easement.

¶ 26                            I. Exclusivity

¶ 27    We note that the relevant legal principles that govern the issues presented here are clear and have been settled for many years, at least as far as this court's precedent is concerned. To establish an easement by prescription, the use of the way in question must have been—for a 20-year period—adverse, uninterrupted, exclusive, continuous, and under a claim of right. *Petersen v. Corrubia*, 21 Ill. 2d 525, 531 (1961). Where there has been privity between users,

periods of use may be tacked together to satisfy the requisite prescription period. See *Healy v. Roberts*, 109 Ill. App. 3d 577, 579 (1982); *Roller v. Logan Landfill, Inc.*, 16 Ill. App. 3d 1046, 1053 (1974).

¶ 28    An easement is a right or privilege in the real estate of another (*Beloit Foundry Co. v. Ryan*, 28 Ill. 2d 379, 389 (1963)), but it is by definition a nonpossessory interest (see *Steinbach v. CSX Transportation, Inc.*, 393 Ill. App. 3d 490, 519 (2009); *Great Atlantic & Pacific Tea Co. v. La Salle National Bank*, 77 Ill. App. 3d 478, 482 (1979) (citing Restatement of Property § 450 (1944)); see also Restatement (Third) of Property (Servitudes) § 1.2(1) (2000) ("An easement creates a nonpossessory right to enter and use land in the possession of another.")). Thus, there is no requirement in the law of easements that the owner of the land be altogether deprived of possession or use of the land. "Exclusive" in the context of a prescriptive easement claim "does not mean that no one may or does use the way, except the claimant of the easement. It means no more than that his right to do so does not depend upon a like right in others, and it does not mean that the claim is necessarily well founded." *Petersen*, 21 Ill. 2d at 531; *Leesch v. Krause*, 393 Ill. 124, 129 (1946); see also *McKenzie v. Elliott*, 134 Ill. 156, 163 (1890) ("it is not necessary that the one who claims the easement should be the only one who can or may enjoy that or a similar right over the same land"). Indeed, this court has plainly and consistently held that a claimant's use may be "exclusive" within the meaning of this rule, even though the owner of the fee title to the land also makes use of the road or way in question. *Look v. Bruninga*, 348 Ill. 183, 190 (1932); *Schmidt v. Brown*, 226 Ill. 590, 599 (1907). Finally, it is well settled that "[w]here a way has been used openly, uninterruptedly, continuously and exclusively for more than a period of twenty years, the origin of the way not being shown, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located." *Rush v. Collins*, 366 Ill. 307, 315 (1937).

¶ 29    Relying upon *Catholic Bishop*, Nationwide argues that the Pobudas were required to prove that they "exclusively used" the easement property and "altogether dispossessed" the titleholder for the 20-year period. We reject this standard as contrary to our precedent and at odds with a logical understanding of the nature of an easement and how it is acquired.

¶ 30    *Catholic Bishop* relied upon two other first district cases—*Chicago Steel* and *City of Des Plaines*. All three cases in turn relied upon this court's holding in *Towle v. Quante*, 246 Ill. 568, 576 (1910), for their determination that the rightful owner must be "altogether deprived of possession." The problem with the first district's reliance upon *Towle* is that *Towle* was an adverse possession case. There was no issue of a prescriptive easement in *Towle*, and the first district's reliance upon that case was erroneous because the exclusivity requirement in prescriptive easement cases differs from the strict exclusivity of adverse possession.

¶ 31    Adverse possession's strict version of the exclusivity requirement is grounded in a distinct theory that cannot logically be superimposed onto easement law. Dena Cohen, *Exclusiveness in the Law of Prescription*, 8 Cardozo L. Rev. 611, 628 (1987). This is because the adverse possession claimant must "possess" the land as owner and possession denotes physical control over property. *Id.* Because two people cannot possess the same thing, the concept of possession itself embodies exclusiveness for purposes of adverse possession. *Id.* On the other hand, one does not possess an easement:

- 9 -

"Easements allow only a limited right to *use* the servient land and the control necessary for possession is not a characteristic of this use. The creation of an easement, by any method, does not deprive the servient owner of any portion of the fee soil. Not only is the owner's title not challenged, but once an easement has been acquired, the claimant has no right to exclude the owner or anyone else. However, when one acquires title by adverse possession, one gains the right to exclude all." (Emphasis in original.) *Id*.

¶ 32    To state it another way, obtaining ownership of land through adverse possession means that the original owner has been divested of his title; in contrast, gaining an easement by prescription merely means that the true owner's right to exclude the claimant from using the easement for a certain limited purpose, such as traveling over it, has been divested. See *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 76. The Restatement (Third) of Property describes the difference between the two doctrines as follows: "To acquire an interest by adverse possession, the claimant must maintain exclusive possession of the claimed property during the statutory period. To acquire a servitude, however, the claimant is only required to use the property during the prescriptive period." Restatement (Third) of Property (Servitudes) § 2.17 cmt. a (2000). And the use required by the claimant to obtain the easement need not exclude the titleholder. *Id*.

¶ 33    The difference between the two doctrines in terms of the proof required to satisfy the exclusivity element is justified, then, because of the lesser interests at stake in gaining the easement and because it is possible for the titleholder and the claimant to simultaneously use the same strip of property. This court has therefore repeatedly held that exclusivity in the context of a prescriptive easement "means no more than that [the claimant's] right to [use the way] does not depend upon a like right in others." *Petersen*, 21 Ill. 2d at 531; *Leesch*, 393 Ill. at 129; *Rush*, 366 Ill. at 314; *Look*, 348 Ill. at 189; *Schmidt*, 226 Ill. at 599; *McKenzie*, 134 Ill. at 163.

¶ 34    Although exclusivity is clearly an element of a prescriptive easement claim under Illinois law, it does not require, as the appellate court held, that the claimant prove that the titleholder was altogether deprived of possession and/or use of the property during the 20-year period. Instead, this court's holdings in cases such as *Schmidt*, *Look*, *Leesch* and *Petersen* remain the controlling law.

¶ 35    In *Schmidt*, for example, Smith and Brown owned adjacent farms. Brown's 80-acre farm was directly north of the Smith farm. Brown accessed his farm home by leaving a public road at the south boundary of the Smith farm and traveling over the length of the Smith farm by means of a private road to reach the Brown farm to the north. This private road passed between Smith's house and his barn as it extended north to the Brown property. It was clear that both Smith and Brown used the road. At one point, Smith put up gates to allow his livestock to pass and repass to water, but the gates were never locked and did not interfere with Brown's travel. The Brown family used the way for more than 50 years until Schmidt, a subsequent owner of the Smith farm, filed suit to stop Brown's family from using the road. This court in *Schmidt* held as follows:

"Brown's use of this road was adverse, uninterrupted, continuous and exclusive and under a claim of right. The fact that other persons also used the roadway does not prevent Brown's use[ ] from being exclusive. 'Exclusive use' does not mean that no

one used the way except the claimant of the easement. It means no more than that his right to do so does not depend on a like right in others. The use may be exclusive, within the meaning of this rule, even though Smith and others also used the road." *Schmidt*, 226 Ill. at 599.

¶ 36    Similarly, in *Leesch*, this court found the exclusivity element for a prescriptive easement to have been established even though the owner of the land continued to use and possess the roadway in question that traveled across his land to three separate tracts of land to the east that were owned by the three separate easement claimants. *Leesch*, 393 Ill. at 125-26, 129.

¶ 37    The appellate court's holding in the present case is directly at odds with *Schmidt* and *Leesch* and the other settled precedent of this court. We find that the appellate court—and the line of first district cases it relied upon—erred in superimposing the adverse possession understanding of exclusivity onto the law of easements by prescription. We therefore overrule those first district decisions.

¶ 38    Nationwide argues that this court's precedent in cases such as *Schmidt* should be read to include the following qualifying limitations: "[A] titleholder's use of the property over which someone claims a prescriptive easement may not destroy exclusivity if: (i) the titleholder or his predecessor in title was on full notice of the claim of a prescriptive easement; (ii) the titleholder or his predecessor in title acknowledged the validity of that claim; and (iii) the claimant or his predecessor was induced to detrimentally rely on the representation that an easement existed." In the alternative, Nationwide asks that this court to overrule *Schmidt* and *Look* and the other precedent of this court that holds that the element of exclusivity does not require the titleholder to be deprived of the use or possession of the property that is subject to the prescriptive easement claim. Nationwide asserts that our precedent is "inconsistent with the current trend in Illinois law" and does not protect the titleholder's interest in receiving fair notice that someone else claims an adverse interest in his property. We reject each of Nationwide's arguments.

¶ 39    This court did not limit its prior holdings to the grounds urged by Nationwide, and we decline to do so now. Whether the landowner acknowledged the user's claim of right or induced detrimental reliance are irrelevant to the exclusivity element. Moreover, the concern for fair notice to the owner goes to the adversity element and, in any event, Nationwide's understanding of what constitutes fair notice under the circumstances of this case is skewed. As we will explain more fully below in our discussion of adversity, the origin of the way was unknown and there was no evidence to indicate that the use was by permission. In such a case, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located. *Rush v. Collins*, 366 Ill. 307, 315 (1937). The law favors this conclusion because it is reasonable to assume that the owner would not have acquiesced to the use for so long when it was in his interest to have interrupted it, unless he felt that the party using it had a right that could not be defeated. *Id*. "Because it can work no injustice to anyone, except to him who has been guilty of great negligence, public policy and convenience require that this presumption should prevail in order to promote the public peace and quiet claims of possession." *Id*.

¶ 40    We agree with the reasoning of *Rush* and the public policy rationale it sets forth. We therefore find no reason to depart from the settled precedent of this court. Nationwide's claim that *Schmidt* and *Look* are inconsistent with the "current trend" in Illinois law amounts

simply to a reliance on the *Catholic Bishop* line of authority decided by the first district appellate court, which has not been followed by other districts of our appellate court (see *Brandhorst*, 2014 IL App (4th) 130923), and which we have already determined was wrongly decided.

¶ 41                                 II. Adversity

¶ 42     We now turn to Nationwide's alternative argument that even if this court overrules the *Catholic Bishop* line of cases, summary judgment for Nationwide should nonetheless be affirmed because the Pobudas cannot establish the element of adversity.

¶ 43     To satisfy the element of adversity, "[t]he use must have been enjoyed under such circumstances as will indicate that it has been claimed as a right, and has not been regarded by the parties merely as a privilege or license, revocable at the pleasure of the owners of the soil." *Rose v. Farmington*, 196 Ill. 226, 229 (1902). Mere permission to use land cannot ripen into a prescriptive right, no matter how long the permissive use is enjoyed. *Monroe v. Shrake*, 376 Ill. 253, 256 (1941); *Rush*, 366 Ill. at 315. Thus, "adverse" and "claim of right" are synonymous terms that are equated with use that is not subordinate to the owner's title. Cohen, *supra* at 624. It is not essential that there should be proof that the claimant of an easement made any oral declaration of a claim of right, but it will suffice if the facts show that he acted so as to indicate that he did claim the right to such use. *Petersen*, 21 Ill. 2d at 532-33.

¶ 44     As mentioned above, this court in *Rush* set forth the criteria for establishing a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located:

> "Where a way has been used openly, uninterruptedly, continuously and exclusively for more than a period of twenty years, the origin of the way not being shown, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located. This presumption of a grant or adverse right is *prima facie* merely and may be rebutted. In the absence of evidence tending to show that such long-continued use of the way may be referred to a license or other special indulgence, which is either revocable or terminable, the conclusion is, that it has grown out of a grant by the owner of the land, and has been exercised under a title thus derived. *** The facts to admit of such presumption, however, are not presumed but must be established by the greater weight of the evidence." *Rush*, 366 Ill. at 315.

¶ 45     We note that normally the question of whether a use is adverse under a claim of right for a period of 20 years, or the use of the way is only permissive, is a question of fact for the trier of fact. See *Petersen*, 21 Ill. 2d at 532. Here, however, the essential facts are not in dispute and the parties have filed cross-motions for summary judgment, inviting the court to decide the issue as a matter of law. Accordingly, we may decide the issue based on the affidavits and deposition testimony contained in the record.

¶ 46     We believe that the record unequivocally indicates that the origin of the way across the northwest corner of the 275 property has *not* been shown and that it is unknown. The deposition testimony of Mayworm is the last eyewitness evidence in the record as to the use of the way and she testified that the way across the northwest corner strip was already established when she bought the 281 property in 1971. She testified that traveling over the

northwest strip was the only way to and from her property, and she never discussed permission to travel that way with anyone at anytime. She also noted that when she purchased the property from the former owners, they did not inform her that permission was required to travel across the strip. Given the nature of Mayworm's testimony and the fact that there is no evidence in the record from any owner prior to Mayworm, we can only conclude based on this record that the origin of the way is unknown.

¶ 47 It could be speculated that the origin was that the original owners of the 275 property merely granted permission to the original owners of the 281 property to travel across the northwest corner strip because the newly installed utility equipment that served both properties would have blocked access to the owners of the 281 property on the north side of their property line to and from the recorded gravel road easement. It is also possible that the original owners of each property had a parol agreement to grant an easement to the owners of the 281 property in exchange for allowing the utility equipment that served both properties to be installed on the northeast corner of the 281 property. Neither of those scenarios, however, has been shown. Given the absence of evidence that the origin of the way was merely permissive, the presumption is that of a right or grant based on the long acquiescence of the owners on whose land the way is located. See *Rush*, 366 Ill. at 315. The presumption "developed on the theory that where a right-of-way existed with the knowledge and acquiescence of the owner of the premises for a sufficient period of years, it was presumed that he or his predecessors in title had actually granted an easement and that the easement document had been lost." See *Ruck v. Midwest Hunting & Fishing Club*, 104 Ill. App. 2d 185, 189 (1968).

¶ 48 Nationwide contends that the Pobudas cannot claim this presumption because the evidence shows that "neighbors simply began using one another's driveways," and evidence of a neighborly relationship gives rise to a presumption of permissive use. See, *e.g.*, *Piper v. Warren*, 61 Ill. App. 2d 460, 462-63 (1965); *Deboe v. Flick*, 172 Ill. App. 3d 673, 676 (1988); *Castle v. Yenerich*, 95 Ill. App. 3d 39, 45 (1981). The cases cited by Nationwide for this proposition are inapplicable here, however, because the presumption of permissive use described in those cases does not cover the facts of the present case.

¶ 49 For example, in *Piper*, the origin of the way was shown and the court distinguished *Rush* on that basis. *Piper*, 61 Ill. App. 2d at 463. In *Piper*, the parties shared a common boundary between their adjacent driveways. The defendant, however, erected a fence on the edge of his driveway, and the plaintiffs filed suit contending that for over 30 years the plaintiffs and their predecessors in title had continuously used a portion of the defendant's driveway for ingress and egress. One of the defendant's predecessors in title testified as to the origin of the use, stating that "[o]ccasionally Kilpatricks used our driveway and we used theirs and there was nothing in writing." *Id*. at 464. *Piper* found that there was no presumption of a grant or a claim of right. The court noted that plaintiffs' and their predecessor's use of the defendant's driveway "was under an implied license, a mere extension of neighborly courtesy." *Id.* at 465-66.

¶ 50 *Piper*, then, is clearly distinguishable from the present case, as there the origin was shown—from the direct testimony of the defendant's predecessor—to have been permissive based on the fact that it sprung from a neighborly relationship where the owners simply began using one another's driveways and had no agreement in writing. Here, in contrast, we

- 13 -

have no idea whether the origin of the use sprung out of a neighborly relationship so as to be considered permissive.

¶ 51    *Deboe* was another case where two neighbors had driveways that abutted each other at their shared property line. *Deboe*, 172 Ill. App. 3d at 675. Again, the defendants erected a fence on the edge of their driveway and property line, and the plaintiffs filed suit claiming a prescriptive easement. In that case, the record contained direct testimony as to the origin of the way, with the defendants' predecessor in title testifying that he gave express permission to the plaintiffs to use the driveway, which they often did by coming a foot or so onto his property. *Id*. at 676. *Deboe* is thus distinguishable from the present case in that the origin of the way was shown by direct evidence that permission was granted at a time when the neighbors were on friendly terms.

¶ 52    In *Castle*, the evidence established that in order to reach a tract of land that the defendants owned and used for recreational purposes, they had to walk on a path that crossed the plaintiffs' land. *Castle*, 95 Ill. App. 3d at 42. The trial judge concluded that the way in question, which arose 55 years earlier, was founded on a neighborly relationship that the defendants' family originally had with the plaintiffs' predecessor in title and was therefore a permissive use. The trial judge concluded that the use was permissive from the testimony of one of the defendants that the plaintiffs' predecessor in title did not object to his use of the way because " 'he was just like one of the family.' " *Id*. at 44. There was also evidence that around the time that the defendants first began to use the way, they had requested permission from the plaintiffs' predecessor to haul lumber out along the way. Permission was granted but then revoked five years later. Thus, *Castle* is distinguishable from the present case on two bases: the origin of the use in *Castle* clearly arose out of a neighborly relationship, and the defendants asked permission of the owners to use the would-be easement, thus negating the notion that the use was under a claim of right.

¶ 53    The appellate court in *Castle* correctly affirmed the trial court's ruling that the defendants had not established a prescriptive right. *Id*. at 45. In so doing, however, the appellate court blemished its rationale when it stated that "[o]n the basis of the evidence at hand, the origin of the way not having been established, it is logical to suppose that the use of it developed out of a neighborly relationship and we cannot presume that it arose out of a claim of right." *Id*. The problem with the appellate court's analysis is that the origin of the way was established in that case. The court seemed to recognize this earlier in its opinion when it stated that based on the evidence "the trial court evidently concluded that the use of the way in question was founded on a neighborly relationship *originally* and was, therefore, a permissive use." (Emphasis added.) *Id*. at 44. We do not believe that *Castle* should be read to support the notion that, contrary to *Rush*, where the origin is unknown, it must be assumed that it grew out of a neighborly relationship. Rather, it is the evidence of the neighborly relationship at the inception of the use that may under the appropriate circumstances show the origin of the way.

¶ 54    In contrast to the authority relied upon by Nationwide, the present case presents a number of factors that combined show that the use was continuously adverse and under a claim of right for the duration of the prescriptive period. As previously stated, the origin of the way was not shown. Although the evidence showed that Mayworm eventually developed a neighborly relationship with Nationwide's predecessor in title, it is also the case that this was

not the origin of the use, but rather that the way had already been established at the time of Mayworm's purchase. That a neighborly relationship later developed is completely consistent with the lost grant theory and with the notion that the owners of the land would not have acquiesced in Mayworm's and the Pobudas' enjoyment unless they felt "conscious that the party enjoying it had a right and a title to it that could not be defeated." See *Rush*, 366 Ill. at 315. Moreover, both Mayworm and the Pobudas asserted that they acted under a claim of right in using the northwest corner strip, and there is no evidence that their use was ever permissive. They were not required to orally communicate their claim of right to the owners of the 275 property where all of the surrounding circumstances should have served as notice of their claim, including that (1) their driveway opened up and continued onto the northwest corner strip, (2) they openly used the strip on a daily basis for three decades in a manner that was regularly observed by the owners of the 275 property, (3) they had no other existing driveway as a means of ingress and egress to the gravel road easement, and (4) they conducted maintenance of the northwest corner strip without ever seeking permission to do so.

¶ 55 Citing *Monroe v. Shrake*, 376 Ill. 253 (1941), Nationwide argues that resurfacing and plowing snow off the northwest corner strip by the Pobudas and their predecessor should not be considered inconsistent with permissive use. We find Nationwide's reliance upon *Monroe* to be misplaced. There, the roadway claimed as a prescriptive easement was on vacant, unoccupied land. This court noted the well-settled rule that use of vacant and unoccupied land is presumed to be permissive and not adverse. *Id*. at 256. It was in this context that the court stated that the defendant's upkeep of the road did not, in and of itself, show a claim of right because it was consistent with the presumptively permissive use flowing from defendant's use of vacant and unoccupied land. *Id*. at 256-57. In contrast, we believe that the circumstances surrounding the Pobudas' and Mayworm's use, including their maintenance of the strip, was sufficient to raise a red flag of a claim of right over the occupied land involved in this case.

¶ 56                                    CONCLUSION

¶ 57 For the foregoing reasons, we conclude that as a matter of law the Pobudas satisfied the elements of exclusivity and adversity necessary to establish a claim for a prescriptive easement. Our resolution of these issues renders it unnecessary to address the Pobudas' remaining contention of bias.

¶ 58 Accordingly, we reverse the appellate court's decision affirming the trial court's grant of partial summary judgment in favor of Nationwide. We also reverse the appellate court's decision affirming the denial of the Pobudas' motion for summary judgment. We remand the cause to the circuit court of Cook County for further proceedings consistent with this opinion.

¶ 59 Judgments reversed.

¶ 60 Cause remanded.